(185 P.3d 935)
No. 98,806

STATE OF KANSAS, *Appellee,* v. DALLAS AUCH, *Appellant.*

Opinion filed April 18, 2008.

*Dallas Auch,* appellant pro se.

*Ezra J. Ginzburg* and *John W. Campbell,* special assistant attorneys general, of Kansas Insurance Department, and *Paul J. Morrison,* attorney general, for appellee.

Before BUSER, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: Dallas Auch appeals his jury trial conviction of one count of forgery in violation of K.S.A. 21-3710(a)(1). Auch raises five arguments on appeal. First, Auch argues that the trial court committed plain error by allowing him to be prosecuted on multiple counts of forgery, which exposed him to double jeopardy and undue prejudice at trial. Nevertheless, because Auch was not convicted of multiple violations of the same statute, we find no double jeopardy violation under our Supreme Court's decision in *State v. Schoonover,* 281 Kan. 453, 133 P.3d 48 (2006). In addition, Auch's failure to provide this court with a trial transcript in the case hampers appellate review of this issue. The limited record before this court, however, demonstrates that the multiple forgery charges against Auch were based on separate forgery acts. Accordingly, Auch's argument on this issue fails.

Next, Auch contends that prosecution of the case did not begin within the time required by K.S.A. 2004 Supp. 21-3106. We disagree. Under the rule announced in *State v. Nunn,* 244 Kan. 207, 768 P.2d 268 (1989), Auch's prosecution was timely as it was commenced within the 5-year expanded statute of limitations under

K.S.A. 2005 Supp. 21-3106(4). Next, Auch maintains that his trial counsel was ineffective in failing to raise objections to multiplicitous charges and untimely prosecution. Nevertheless, we determine that Auch is unable to show that he was prejudiced by his counsel's conduct. Therefore, his ineffective assistance of counsel claim fails. Next, Auch contends that the State was unable to prove the element of intent to defraud for the charge of forgery. Again, Auch's failure to provide this court with a trial transcript precludes appellate review of this issue. Finally, Auch contends that he was denied a fair trial by postings on the trial court's case history website. Nevertheless, because the limited appellate record fails to show that prejudice resulted to Auch from the case history postings, he is not entitled to a mistrial in this case. Accordingly, we affirm.

Because the parties have failed to provide this court with the trial transcript in the case, the facts were taken from those brought out at the preliminary hearing and those contained in the exhibits and documents found in the record.

On October 16, 2003, Auch met with Mitchell Vandeputte and his wife, Melinda Vandeputte, in their home regarding health insurance coverage. When the meeting occurred, Auch was an insurance agent with Mega Life and Health Insurance Company (Mega). According to the Vandeputtes, Melinda had contacted Auch because they wished to obtain more affordable health insurance coverage than the current coverage they had through Melinda's employer. At the preliminary hearing, both Mitchell and Melinda testified that the first thing they talked about with Auch was that they did not want monthly bank drafts coming out of their bank account. Instead, they wanted to be billed monthly. According to Melinda, they told Auch that if they had to pay by automatic bank draft, then they did not want the insurance policy.

During their meeting with Auch, the Vandeputtes decided on health insurance coverage. Mitchell testified that Auch filled out the application for them, that Mitchell signed some preprinted forms, and that Melinda wrote a $677 check, which was to pay for 3 months of health insurance premiums and a one-time application fee of $65. According to Mitchell, Auch explained that the National

Association of Self Employed People (NASE) provided several additional benefits for self-employed people but that Vandeputte did not need those benefits. Mitchell testified that he told Auch that he did not want the NASE benefits.

The Vandeputtes later received a Mega health insurance policy, a NASE membership booklet, and other documents in the mail. In accordance with K.A.R. 40-4-22, Mega health insurance policies had a "10 Day Right to Examine the Policy," which essentially allowed the insured to return the policy within 10 days of receipt if he or she was not satisfied that the coverage would meet his or her insurance needs. Mega would then cancel coverage as of the policy date, refund all premiums paid, and treat the policy as if it were never issued.

While reviewing the Mega policy, Mitchell noticed that the listed coverage was incorrect and that there was inaccurate information on the application. Mitchell also discovered that NASE was billing him $35 a month. In addition, Mitchell discovered some forms had been signed with his name, but the signature was not his. One of these forms was an authorization for direct payment from the Vandeputtes' checking account.

Mitchell testified that he called Auch to attempt to straighten out his health insurance coverage. Mitchell testified that he asked Auch about the signature on the automatic bank withdrawal form because he had explicitly told Auch that he did not want automatic bank withdrawal when he first met with Auch. Auch said that his secretary must have signed the form. Auch told Mitchell that he would come back to their house and they would get everything straightened out.

Auch came to the Vandeputtes' home around November 17, 2003, and filled out a second insurance application with the Vandeputtes. Testimony from Mega representatives at the preliminary hearing showed that Auch would have received higher advances and a higher commission under the first application.

When Mitchell received the second insurance policy from Mega in the mail, he noticed there were still some inaccuracies. Moreover, from late November 2003 through March 2004, Mitchell continued being billed monthly by NASE. Mitchell eventually met

with a different insurance broker. The insurance broker advised Mitchell that in order for NASE to be billing him for membership dues, there had to have been a membership application submitted to it.

After calling and having a copy of his NASE membership application faxed to him, Mitchell discovered that someone other than him had signed his name to the application. In addition, Mitchell discovered that someone had signed his name to a separate entity notice to NASE. Mitchell testified that he did not see those documents or the authorization for the automatic bank draft on October 16, 2003, the date they were supposedly signed, and that he did not give anyone authorization to sign those documents for him.

Mitchell wrote the Kansas Insurance Department about the situation. The Kansas Insurance Department began an investigation. As a result of the investigation, Auch wrote to Mega explaining his actions pertaining to the Vandeputtes' insurance coverage. Auch explained that when he went to turn in the Vandeputtes' documents after their October 2003 meeting, he discovered that a few required forms were missing. Auch stated that he called Melinda and explained to her that either he could sign the required forms or that he could meet with the Vandeputtes again. Auch stated that he explained to Melinda that anything the Vandeputtes did not want could be corrected under the 10-day rights to examine provision when the policy came out of underwriting. According to Auch, Melinda told him to sign the forms and send them in because they wanted to start coverage as soon as possible.

Apparently, Mitchell paid a total of $105 in NASE membership fees, but that amount was eventually refunded to him. The State and Auch stipulated that the Vandeputte's bank account was never actually debited by Mega or NASE as a result of the bank draft that was submitted. Moreover, testimony at the preliminary hearing indicated that any excess Mega insurance premiums collected from Mitchell were refunded to him.

Auch was charged with one count of forgery of the NASE membership application in violation of K.S.A. 21-3710(a)(1), one count of forgery of the separate entity notice to NASE in violation of K.S.A. 21-3710(a)(1), one count of forgery of the authorization for

direct payment to NASE in violation of K.S.A. 21-3710(a)(1), and three counts of making a false information in violation of K.S.A. 21-3711. Before trial, the trial court granted the State's motion to dismiss the three counts pertaining to making a false information. As a result, Auch went to trial on the three forgery counts.

The jury convicted Auch of the forgery charge relating to the authorization for direct payment to NASE and acquitted him of the forgery charges relating to the NASE membership application and to the separate entity notice to NASE. The trial court placed Auch on probation for 18 months with an underlying prison sentence of 8 months.

*Multiplicity*

First, Auch alleges that the trial court committed plain error by allowing him to be prosecuted on multiple counts of forgery, which exposed him to double jeopardy and undue prejudice at trial. Auch alleges that he raised this issue at the trial court level in a posttrial motion for acquittal. Nevertheless, the posttrial motion has not been included in the record on appeal. Assertions in an appellate brief are insufficient to satisfy inadequacies in the appellate record. See *State v. Bloom*, 273 Kan. 291, 307, 44 P.3d 305 (2002).

Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Alger*, 282 Kan. 297, 304, 145 P.3d 12 (2006). Nevertheless, an appellate court has the power to address such issues in exceptional circumstances, such as when consideration of an issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights. *State v. Adams*, 283 Kan. 365, 367, 153 P.3d 512 (2007). As the State points out, our Supreme Court has addressed a multiplicity argument raised for the first time on appeal in order to serve the ends of justice and to prevent denial of fundamental rights. See *State v. Groves*, 278 Kan. 302, 303-04, 95 P.3d 95 (2004); *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 (1984).

The issue of whether convictions are multiplicitous presents a question of law over which an appellate court has unlimited review. *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Quoting *State v. Robbins*, 272 Kan. 158, 171, 32 P.3d 171 (2001), our Supreme Court in *State v. Patten*, 280 Kan. 385, 388, 122 P.3d 350 (2005), explained multiplicity as follows:

" 'Multiplicity is the charging of a single offense in several counts of a complaint or information. The reason multiplicity must be considered is that it creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights.' "

### In *Schoonover*, our Supreme Court held that

"[i]n a case where a defendant is convicted of multiple violations of a single statute, the test to determine whether the convictions violate §10 of the Kansas Constitution Bill of Rights is the same test as used to determine if there is a violation of the Due Process Clause of the Fifth Amendment: whether there is more than one conviction for the allowable unit of prosecution." 281 Kan. at 496.

Further setting forth the analysis to be applied when analyzing a double jeopardy issue, our Supreme Court stated:

"In analyzing a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one? Under the first component, if the conduct is discrete, *i.e.*, committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense. Under the second component, it must be determined whether the convictions arise from a single statute or from multiple statutes. If the double jeopardy issue arises from convictions for multiple violations of a single statute the unit of prosecution test is applied. . . ."

"Some factors to be considered in determining if a conviction is based upon unitary conduct, in other words if a conviction is based upon the 'same conduct,' include: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. 453, Syl. ¶¶ 15-16.

Thus, when determining whether there has been a double jeopardy violation, the central inquiry is whether there are multiple convictions for the same offense. As the State points out, Auch was not *convicted* of multiple violations of a single statute. Although

Auch was charged with three separate felony counts of forgery, he was convicted of only *one* of those counts. Because Auch was not convicted of multiple violations of the same statute, there was no double jeopardy violation under *Schoonover.* See *State v. Harris,* 284 Kan. 560, 577, 162 P.3d 28 (2007) (holding that in order to avoid double jeopardy under state and federal Constitutions, defendant could be convicted of only one charged count when multiple charged counts under same statute constituted only one violation of statute).

Moreover, Auch's argument that the three forgery counts were identical and joined by a unitary intent to defraud cannot be adequately examined without review of a trial transcript. Citing preliminary hearing testimony from Mega's new business manager, Auch contends that without all three of the documents (the NASE membership application, the separate entity form, and the bank authorization form) plus the application document, the insurance policy could not have been issued and each of the forms would have become legal nullities. Nevertheless, this limited testimony apparently relates only to the Mega health insurance policy.

The three documents that were the subject of the forgery charges in this case allegedly related to the NASE membership. Mega's new business manager testified that Mega and NASE are separate entities and that an applicant has to contact NASE to make changes to their NASE membership. Because a trial transcript has not been included in the record on appeal, we are unable to review any additional testimony that was presented to the jury concerning the documents and how they related to Auch's NASE membership. Without a trial transcript, we cannot adequately evaluate Auch's argument. "Where an appellant has failed to procure an official transcript or abstract the testimony of record or reconstruct it in some accepted manner, this court will not review any action of the trial court requiring an examination of the evidence." *First Nat'l Bank & Trust Co. v. Lygrisse,* 231 Kan. 595, Syl. ¶ 9, 647 P.2d 1268 (1982).

Finally, as the State argues, it seems that the conduct for each count charged against Auch was discrete. The forgery charges were based upon three acts of signing three separate and distinct instru-

ments. Count I of the original complaint involved forgery of a NASE membership application. Count III involved forgery of a separate entity notice to NASE. Count V involved forgery of an authorization for direct payment to NASE. As pointed out by the State, each forgery count required the jury to consider whether Auch had the intent to defraud when he signed another person's name to three separate and distinct written instruments.

The jury in this case was appropriately instructed that each forgery count constituted a separate and distinct offense: "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged." The jury was also separately instructed on the elements for each forgery count. The jury ultimately found that the State had proven beyond a reasonable doubt that Auch had committed the crime of forgery and, therefore, had the requisite intent to defraud, as to the authorization for direct payment to NASE but not as to the NASE membership application and the separate entity form to NASE.

The State maintains that Auch's arguments require this court to speculate as to why the jury reached the results it did. Nevertheless, our Supreme Court has held that the conduct of a jury is sometimes devoid of logic and may result in inconsistent verdicts. Even in cases where the two verdicts are irreconcilable, the convictions will not be reversed on grounds of inconsistency. See *State v. Beach*, 275 Kan. 603, Syl. ¶ 4, 67 P.3d 121 (2003). As the State points out, the acquittal of Auch on two forgery counts does not render the conviction on the third forgery count a nullity. As a result, Auch's arguments on this issue fail.

### Commencement of Prosecution

Next, Auch argues that the prosecution of this case did not begin within the time limit imposed by K.S.A. 2004 Supp. 21-3106 and, therefore, his conviction should be reversed. As the State points out, the record fails to show that Auch raised this issue before the trial court. Generally, issues not raised to the trial court cannot be

raised on appeal. *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007). Nevertheless, an appellate court has the power to address such issues in exceptional circumstances, such as when consideration of an issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights. *Adams*, 283 Kan. at 367.

Auch's argument requires interpretation of statutes. Interpretation of a statute presents a question of law over which an appellate court's review is unlimited. This court is not bound by the trial court's interpretation of a statute. See *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006).

Auch committed the alleged crimes in the instant case on or about October 16, 2003. At that time, K.S.A. 2003 Supp. 21-3106(8) provided that the prosecution for the alleged crimes must be commenced within a 2-year period. Nevertheless, effective July 1, 2005, the legislature changed the 2-year statute of limitations for the alleged crimes to 5 years. See K.S.A. 2005 Supp. 21-3106(4). Although Auch argues that the 2005 amendment to K.S.A. 21-3106 did not become effective until December 19, 2005, the legislative history immediately following the statute clearly shows that the amended statute took effect on July 1, 2005. See K.S.A. 2005 Supp. 21-3106. The State commenced prosecution against Auch on September 29, 2005. The certified copy of the appearance docket indicates that the arrest warrant was issued on September 29, 2005, and the warrant had an executed return on November 2, 2005.

Auch maintains that his prosecution needed to be commenced within 2 years from the date of the alleged crimes, which would have been October 21, 2005. K.S.A. 2005 Supp. 21-3106(7) states the following regarding commencement of a prosecution:

"A prosecution is commenced when a complaint or information is filed, or an indictment returned, and a warrant thereon is delivered to the sheriff or other officer for execution. No such prosecution shall be deemed to have been commenced if the warrant so issued is not executed without unreasonable delay."

Auch contends that because no attempt was made to execute the arrest warrant before the statute of limitations expired and because the delay in execution was unreasonable given the totality of the

circumstances, his prosecution should be ruled untimely and his conviction reversed.

Nevertheless, as the State points out, Auch's argument about untimely execution of the arrest warrant ignores the rule in Kansas that an amendment to the statute of limitations in a criminal case is procedural and may be applied before the effective date of the amendment as long as the prior statute of limitations has not expired before the effective date of the amendment. In *State v. Nunn*, 244 Kan. 207, 218, 768 P.2d 268 (1989), our Supreme Court set forth this rule as follows:

"[We] hold that an amendment to a criminal statute of limitations extending the time for commencement of a prosecution is remedial or procedural, not substantive, and may be applied to crimes committed prior to the effective date of the amendment so long as the prior statute of limitations had not expired prior to the effective date of the amendment. Of course, if the statute being amended has run on the specific crime charged, then the amendment cannot be applied to resurrect a prosecution which has already been time-barred."

In *Nunn*, the questions was whether prosecution of one of the counts charged was barred because the prosecution of the case did not commence within the statutory time period. After the crimes were committed, the legislature had amended the applicable statute of limitations from 2 years to 5 years. When the amendment became effective, the prior 2-year statute of limitations for the count charged against the defendant had not expired. Our Supreme Court held that commencement of the prosecution was timely as it was within the extended period of the statute of limitations.

Here, the amendment to the criminal statute of limitations extending the period from 2 years to 5 years became effective July 1, 2005. See K.S.A. 2005 Supp. 21-3106(4). At that time, the prior 2-year statute of limitations for the crimes allegedly committed by Auch had not expired. The prosecution against Auch was commenced in September 2005, and the arrest warrant was executed in November 2005, which were both well within the 5-year statute of limitations period. Based on the rule announced in *Nunn*, the commencement of Auch's prosecution was timely as it was within the extended period of the statute of limitations.

Moreover, based on the limited record before this court, the execution of the arrest warrant approximately 34 days after the complaint was filed (and still within the extended period of the statute of limitations) did not constitute an unreasonable delay. See *State v. McDowell*, 33 Kan. App. 2d 889, 893, 111 P.3d 193 (2005) (holding that when warrant is executed within applicable statute of limitations for crime, then prosecution is not time-barred even though there may have been unreasonable delay in executing warrant). Accordingly, Auch's argument fails.

*Ineffective Assistance of Counsel*

Next, Auch contends that his trial counsel's failure to raise objections to multiplicitous charges and untimely prosecution constituted ineffective assistance of counsel. A claim alleging ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. *Bledsoe v. State*, 283 Kan. 81, 91, 150 P.3d 868 (2007). Before counsel's assistance is determined to be so defective as to require reversal, Auch must establish two things: (1) that his counsel's performance was deficient; and (2) that his counsel's performance prejudiced the defense. See *Bledsoe*, 283 Kan. at 90.

The record fails to show that Auch raised his ineffective assistance of counsel claim with the trial court. Generally, an appellate court will not consider an ineffective assistance of counsel allegation raised for the first time on appeal. *State v. Gleason*, 277 Kan. 624, Syl. ¶ 5, 88 P.3d 218 (2004). Nevertheless, an appellate court can consider a new ineffective assistance of counsel claim where the record on appeal is sufficiently complete to decide the claim. 277 Kan. at 649-50.

The appellate record in this case is sufficiently complete to allow this court to decide Auch's ineffective assistance of counsel claim. Based on our analysis in the previous two issues, Auch cannot prevail in his claim. Even if Auch could somehow show that his counsel was deficient in failing to raise the multiplicity and untimely prosecution arguments, he cannot establish he was prejudiced by his counsel's conduct. Because Auch cannot meet the second prong

of the test for his ineffective assistance of counsel claim, his argument fails.

*Intent Element of Forgery Charge*

Next, Auch argues that the element of intent to defraud could not be proven in this case for the forgery charge because the forged documents did not affect a property right. Although Auch tries to make this an issue of statutory interpretation, he is attacking the verdict based on the State's inability to prove an essential element of the charge. Essentially, Auch is attacking the sufficiency of the evidence to prove the charge.

When the sufficiency of the evidence is reviewed in a criminal case, an appellate court must consider all of the evidence, viewed in the light most favorable to the prosecution, and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Parker*, 282 Kan. 584, 597, 147 P.3d 115 (2006).

Auch's failure to provide a trial transcript in this case precludes this court from reviewing his argument. An appellant has the burden to designate a record that affirmatively establishes the claimed error. Without such a record, an appellate court presumes the action of the trial court was proper. *State v. Goodson*, 281 Kan. 913, 919, 135 P.3d 1116 (2006). Moreover, "[w]here an appellant has failed to procure an official transcript or abstract the testimony of record or reconstruct it in some accepted manner, this court will not review any action of the trial court requiring an examination of the evidence." *Lygrisse*, 231 Kan. 595, Syl. ¶ 9. Without a trial transcript, this court is unable to review the evidence that was presented to the jury and to determine whether there was sufficient evidence to prove the elements of forgery.

Moreover, Auch's argument that an intent to defraud could not be present in this case because no property right was ever affected as a result of Auch's actions lacks merit. To support his argument, Auch maintains that Mitchell invoked the 10-day free look provision under K.A.R. 40-4-22, which rendered his insurance policy null and void. It appears that Auch is referring to the 10-day free look provision in the Mega insurance policy. NASE and Mega were

separate entities providing separate services. Once Mitchell invoked the 10-day free look provision for his Mega policy, he still had to contact NASE to cancel his membership in the association. In fact, the NASE membership application contained the following statement: "Should I withdraw my insurance application (if any) or be declined for coverage for any reason, I understand that I still retain my membership in the NASE." Mitchell continued being billed for his NASE membership through March 2004 and had to seek help from the Kansas Insurance Department to obtain a complete refund of his membership fees.

Based on the limited record before this court, Auch signed Mitchell up for automatic bank drafts for a NASE membership when Mitchell had explicitly told Auch that he did not want automatic bank drafts and did not want a NASE membership. The fact that Mitchell was eventually able to cancel his NASE membership and obtain a refund of his membership fees does not negate Auch's alleged intent to defraud when Auch signed Mitchell's signature to the authorization for bank draft on October 16, 2003.

*Case History Postings*

Finally, Auch contends that the trial court breached its duty to ensure his right to a fair trial by posting a summary statement of inadmissible evidence to the case history website during trial. Auch requests that a mistrial be granted due to the jurors' exposure to this information.

Recognizing that the declaration of a mistrial is within the trial court's discretion, our Supreme Court in *State v. Dixon*, 279 Kan. 563, 592-93, 112 P.3d 883 (2005), stated:

"The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. K.S.A. 22-3423(1)(c). Declaration of a mistrial is a matter entrusted to the trial court's discretion, and the decision will not be set aside on appeal unless an abuse of discretion is clearly shown. The defendant has the burden of proving that he or she was substantially prejudiced. [Citation omitted.]"

Similarly, when reviewing the trial court's decision to grant a new trial, an appellate court is limited to determining whether the trial

court abused its discretion. *State v. Kirby*, 272 Kan. 1170, 1192, 39 P.3d 1 (2002).

Although Auch asserts that he raised his argument in a posttrial motion for mistrial, the motion is not contained in the record on appeal. The clerk's notes indicate that Auch moved for a mistrial due to irregularity in the trial proceedings and that the trial court denied this motion. Nevertheless, because the actual motion is not contained in the record on appeal, we are unable to ascertain the particular arguments that Auch made to the trial court. As the appellant in this case, Auch had the burden to furnish a record that affirmatively shows prejudicial error occurred in the trial court. Without such a record, Auch's claim of alleged error must fail. See *State v. Swafford*, 257 Kan. 1099, 1101, 913 P.2d 196 (1996).

There is nothing in the record that would establish that Auch raised this particular argument with the trial court. Generally, issues not raised before the trial court cannot be raised on appeal. *Shopteese*, 283 Kan. at 339. There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal. See *Shopteese*, 283 Kan. at 339.

Nevertheless, even if Auch's argument was properly before this court, it would fail. In his appellate brief, Auch states that the trial court posted the following statement to its case history website during the defendant's trial: " '06/01/2006 FILE STAMP 6/1/2006, MOTION TO ALLOW EVIDENCE OF DEFENDANT'S ADMISSION OF A GAMBLING AND MONEY PROBLEMS.' " This note is contained in the certified copy of the appearance docket in the appellate record. Auch points out that the trial court refused to admit the evidence because it was irrelevant and prejudicial but that "jurors had easy access to this statement via the internet from the privacy of their own homes." Auch argues that "the jury in this case was more than likely influenced" by the case history posting.

The Fourteenth Amendment to the United States Constitution guarantees a defendant's right to a fair trial. *State v. Johnson*, 258 Kan. 61, 68, 899 P.2d 1050 (1995). K.S.A. 22-3423(1)(c) gives the trial court the discretion to grant a mistrial when it finds that termination is necessary because "[p]rejudicial conduct, in or outside

the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." A mistrial will not be granted under K.S.A. 22-3423(1)(c) unless the rights of either the defendant or the State have been substantially prejudiced. *State v. McCorgary*, 224 Kan. 677, 687, 585 P.2d 1024 (1978).

Auch attempts to analogize the instant case to *Estes v. Texas*, 381 U.S. 532, 14 L. Ed. 2d 543, 85 S. Ct. 1628 (1965), where it was determined that the defendant had been deprived of his right to due process under the Fourteenth Amendment to the United States Constitution by the televising and broadcasting of his trial. There, the Court indicated that under certain inherently suspect circumstances, no showing of prejudice is required and prejudice is presumed. In that case, however, the Court set forth the circumstances of the televised proceedings as follows: the pretrial hearing in the case reached approximately 100,000 viewers; the courtroom was a mass of wires, television cameras, microphones, and photographers; the petitioner, the panel of prospective jurors, the witnesses, and the lawyers were all exposed to this "untoward situation"; the judge decided the proceedings would be telecast and initially imposed no restrictions, which "emphasized the notorious nature of the coming trial, increased the intensity of the publicity on the petitioner and together with the subsequent televising of the trial beginning 30 days later inherently prevented a sober search for the truth"; a substantial amount of time was spent ascertaining the impact of the pretrial televising on the prospective jurors; and four of the jurors selected had seen all or part of the broadcasts. 381 U.S. at 550-51. In addition, setting out the trial court's increasing restrictions on media during the trial, the Court determined that these orders made the trial more confusing to the jury, the participants, and the viewers and resulted in a public presentation of only the State's side of the case. 381 U.S. at 551.

The instant case is easily distinguishable from *Estes*. The media's conduct in *Estes*, along with the trial court's orders concerning the media, permeated the entire pretrial proceedings and the actual trial. As the Court pointed out, the media's conduct and the trial court's orders "inherently prevented a sober search for the truth."

381 U.S. at 550. Moreover, the trial court's orders to the media made the trial more confusing to the jury and resulted in a public presentation of only the State's side of the case. It is clear that these circumstances were inherently prejudicial to the defendant and violated his right to due process.

On the other hand, the present case involves a one-sentence posting to a case history website. There is nothing in the record showing that a juror even saw or commented on the case history posting. As the State points out, there are no affidavits by jurors or any other evidence to suggest that the jury was exposed to inadmissible material during the trial.

Moreover, even if a juror did see the case history posting, such viewing alone could not establish substantial prejudice to warrant the declaration of a mistrial. The statement was a one-sentence posting on the trial court's case history website. There is no evidence in the record to suggest that a juror might have been influenced by the case history posting. The certified copy of the appearance docket shows that the trial court denied the State's motion to admit the evidence. The trial judge in this case specifically instructed the jury that it "must disregard any testimony or exhibit which I did not admit into evidence." The trial judge further instructed the jury that "[y]our verdict must be founded entirely upon the evidence admitted and the law as given in these instructions." Juries are presumed to follow the instructions given by the trial court. *State v. Kunellis*, 276 Kan. 461, 484, 78 P.3d 776 (2003). Because the record in this case fails to indicate that prejudice resulted to Auch from the case history posting, he is not entitled to a mistrial in this case. As a result, Auch's argument on this issue fails.

Affirmed.